UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO: _____

HCAS LLC D/B/A ALIVI TECHNOLOGY, a
foreign limited liability company,

    Plaintiff,

vs.

SUDHAN THOMAS, an individual, and DTS
ENTERPRISES LLC, a foreign limited liability
company,

    Defendants.
_____/

# COMPLAINT

Plaintiff HCAS LLC d/b/a Alivi Technology ("Plaintiff") sues Defendants Sudhan Thomas ("Thomas") and DTS Enterprises, LLC ("DTS," and together with Thomas, "Defendants"), and alleges as follows:

### NATURE OF ACTION

1.    This action arises under Florida state law in connection with Defendants' breaches of a consulting agreement between Plaintiff and DTS and associated wrongful acts, including Defendants' repeated failures to perform their contractual obligations, self-dealing, and fraudulent representations in connection with the foregoing.

2.    Plaintiff retained DTS (through Thomas, DTS's President), as an independent contractor to provide consulting services relating to Plaintiff's implementation of a prepaid, cobranded, closed loop, multiuse card program.

3. Thomas led Plaintiff to believe that DTS was a legitimate company with substantial experience in providing the type of consulting services Plaintiff required for implementation of the program.

4. In reality, Thomas used Plaintiff to perpetuate a scam (allegedly, not his first),[1] whereby he pocketed roughly $75,000 in payments from Plaintiff while shirking DTS's contractual obligations and attempting to wrongfully leverage his position as Plaintiff's consultant for his own financial benefit at Plaintiff's expense, leaving Plaintiff and its employees to clean up the mess left by Thomas—and to incur substantial damages in doing so.

## PARTIES

5. Plaintiff is a Delaware limited liability company with its principal place of business located in Miami-Dade County, Florida, and is *sui juris* in all respects.

6. Upon information and belief, Thomas is a resident of the state of New Jersey and is *sui juris* in all respects. At all material times, Thomas held himself out as being the President of DTS.

7. DTS is a Delaware limited liability company and is *sui juris* in all respects. As of October 12, 2022, DTS's status as a Delaware limited liability company was listed by the Delaware Division of Corporations as "cease good standing" due to non-payment of its taxes; however, as of that date, DTS was still an active Delaware limited liability company. Upon information and belief, at all material times, DTS's principal place of business was and is in the state of New Jersey,

---

[1] *See* Nikita Biryukov, *Sudhan Thomas, Alleged Accomplice Indicted on 26 Counts*, New Jersey Globe (Nov. 2, 2020), https://newjerseyglobe.com/local/hudson/sudhan-thomas-alleged-accomplice-indicted-on-26-counts/; U.S. Attorney's Office, District of New Jersey, *Former Jersey City Board of Education President and Acting Executive Director of Jersey City Employment and Training Program and Associate Charged with Embezzlement, Money Laundering and Fraud*, United States Department of Justice (Nov. 2, 2020), https://www.justice.gov/usao-nj/pr/former-jersey-city-board-education-president-and-acting-executive-director-jersey-city.

[9209.004/5429984/4]

as that is where its "nerve center" existed and/or exists, i.e., where Thomas directs, controls, and coordinates DTS's activities.

## JURISDICTION AND VENUE

8. This Court possesses original jurisdiction pursuant to 28 U.S.C. § 1332, as the parties are diverse and the amount in controversy exceeds $75,000, exclusive of costs and interest.

9. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because: (a) a substantial part of the events or omissions giving rise to this action occurred in this jurisdiction; (b) this Court has personal jurisdiction due to Defendants' minimum contacts in this forum; and (c) the Consulting Agreement between Plaintiff and Defendant (defined below) contains a venue selection clause providing that courts in Miami-Dade County, Florida have exclusive jurisdiction over the Consulting Agreement and the performance thereof.

## GENERAL ALLEGATIONS

10. In or around late April 2021, Thomas began discussions with Plaintiff concerning a potential consulting relationship, pursuant to which Thomas would act as an independent consultant for Plaintiff relating to the buildout and implementation of a new program, specifically, a prepaid, cobranded, closed loop, multiuse card program (the "Program").

11. More particularly, Plaintiff wanted to develop the Program as a service for one of Plaintiff's customers ("Customer") and Customer's members, whereby members could use a prepaid card, holding a fixed dollar amount annually, at a pre-selected group of 10,000 merchant provider locations as payments towards members' out-of-pocket expenses for various medical services.

12. During his initial discussions with Plaintiff, Thomas offered to oversee all aspects of the Program buildout and implementation and to act as an intermediary for Plaintiff with the

various entities that would be involved. Thomas further advised Plaintiff that he would connect Plaintiff with a purportedly independent company to act as the manager for the Program.

13. On or about June 1, 2021, Plaintiff and DTS, through its President, Thomas, entered into a contract setting forth Plaintiff's and DTS's rights and obligations relating DTS's provision to Plaintiff of consulting services concerning the Program (the "Consulting Agreement").

14. Notably, Thomas signed the Consulting Agreement as "Sudhan (Tommy) Thomas," the relevance of which will become apparent below.

15. The Program's expected launch date was January 2022. Thomas (and thus DTS) was aware of this expected launch date.

16. Pursuant to section 1.1 and Exhibit A of the Consulting Agreement, DTS was obligated to provide both pre-launch and post-launch services relating to the Program, including but not limited to the following:

   a. Identify, negotiate with, contract with, and appoint a comprehensive program management fulfillment service provider (the "Program Manager") to launch, manage, and fully support the Program.

   b. Act as a single point of contact between Plaintiff and the Program Manager, carrying out the services of Program director.

   c. Plan and execute the day-to-day and periodic operational oversight of all aspects of the Program, including but not limited to the following:

      i. Card design and printing, welcome kit for Customer and its members, and card activation for Customer's members.

      ii. Merchant provider training, education, activation, and welcome kit.

      iii. 24/7 member and provider support call center.

      iv. Program Manager software.

      v. Program Manager hardware.

      vi. Program creation launch and management.

      vii. Value added services.

      viii. Daily file transfers, accounting reconciliation, and bank transfers.

      ix. Reports.

17. Thus, as the unambiguous terms of the Consulting Agreement make apparent, DTS's contractual obligations included managing relations on Plaintiff's behalf with Customer and its members concerning the Program and acting as the intermediary between Plaintiff and the purportedly independent Program Manager.

18. Further, the terms of the Consulting Agreement make apparent that DTS, and thus Thomas, was to represent Plaintiff's interests as the director of the Program, including in his interactions with Customer and the Program Manager.

19. In exchange for DTS's provision of the foregoing services, Plaintiff was obligated to pay DTS as specified in the Consulting Agreement and later modified by the parties.

20. Thomas appointed and introduced non-party AVJ Consultants Company Inc. ("AVJ") to Plaintiff as the Program Manager.

21. Thomas presented AVJ, and AVJ presented itself, to Plaintiff as a company experienced in the technology and systems necessary to implement and manage the Program.

22. Accordingly, on or about June 8, 2021, Plaintiff entered into a separate independent contractor agreement with AVJ to act as the Program Manager for the Program (the "AVJ Agreement").

23. Thomas, as President of DTS, connected Plaintiff with AVJ to service the Program,

purportedly as an arms-length vendor.

24. At the time Plaintiff entered into the AVJ Agreement, Plaintiff was unaware of any connections, personal or professional, between Thomas and DTS, on the one hand, and AVJ, on the other.

25. Beginning in or around December 2021, Plaintiff began requesting in-person meetings with AVJ to discuss issues relating to the Program. AVJ made several false promises to arrange such meetings, but never followed through.

26. Around that same time, Plaintiff began to receive multiple, significant complaints from Customer concerning DTS and Thomas. These included complaints that Thomas:

 a. was "argumentative and vague" with Customer and its employees;

 b. failed to meet deadlines;

 c. failed to provide accurate information in response to specific requests from Customer;

 d. failed to provide promised responses to e-mails and questions;

 e. failed to use the language and format in welcome e-mails to members that had been approved by Customer;

 f. failed to provide required reports to Customer;

 g. failed to provide timely responses relating to implementation of the Program smartphone apps; and

 h. generally failed to perform in a manner necessary to effectuate successful and timely implementation of the Program.

27. Customer became so frustrated with Thomas that, in or around January 2022, it asked Plaintiff to provide another individual to handle its questions concerning implementation of

the Program and related issues.

28.     As a result of Thomas's failures, Plaintiff was forced to allocate additional resources and personnel towards implementation of the Program to maintain Plaintiff's business relationship and associated goodwill with Customer, to Plaintiff's financial detriment. These resources and personnel were necessary to ensure completion of services that Thomas was contractually obligated, but had failed, to provide.

29.     In addition to not performing DTS's contractual obligations, Thomas attempted to reap even more unearned financial benefits for himself through the contacts he made and the information he gained in his position as a consultant for Plaintiff.

30.     As just one example, beginning in or around February 2022, Thomas approached one of Plaintiff's merchant providers (an optometrist located in Miami) on multiple occasions, seeking to recruit that provider for a scheme Thomas concocted to essentially steer members to that provider. More specifically, Thomas proposed using Plaintiff's telephone system to make outbound calls to notify members of the Program, solicit their participation in same, route the members to that provider for services that would be covered by the Program, and then charge that provider for generating those "leads." Not only does this scheme present multiple conflicts of interest, but implementing it would also violate numerous laws and regulations.

31.     Additionally, on multiple occasions, Thomas introduced himself to at least six different AVJ subcontractors as the director, principal, and/or majority shareholder of AVJ, referring to himself as "Tom" or "Tommy." These subcontractors included shipping, logistics, and call center support subcontractors located in the United States, Turkey, and Spain. Thomas made these representations verbally and through the use of an AVJ e-mail address, "tom@avjconsultants.in". At no time did Thomas disclose this obvious conflict of interest to

Plaintiff.

32. Further, subsequent to the execution of the AVJ Agreement, Thomas organized conversations between Plaintiff and the purported CEO or "Group Chairman" of AVJ, during which AVJ's purported CEO or "Group Chairman" advised Plaintiff that he and Thomas were lifelong friends.

33. Thomas's obvious conflicts of interest did not end there. Thomas also approached Extra Loyalty Solutions Joint Stock ("ELS"), the company subcontracted by AVJ to provide the actual online platform for many of the services AVJ contracted to supply, with yet another proposed scheme, pursuant to which Thomas—purporting to act on behalf of AVJ—proposed brokering a sale of ELS's application and associated technology directly to Plaintiff for a potential selling price of $1 million, with ELS and Thomas to split the proceeds from the sale. Thomas committed this act via e-mail to ELS, again referring to himself as "Tom" or "Tommy" from AVJ (as he frequently did with other vendors).

34. Moreover, Thomas repeatedly made material misrepresentations to Plaintiff concerning performance of his obligations under the Consulting Agreement. For example, Thomas assured Plaintiff that cards and confirmation e-mails had been sent to members, when in fact they had not. Thomas further conspired with AVJ to alter the card delivery figures and report false figures to Plaintiff.

35. As a result of the foregoing breaches, actions, and inactions by Defendants, on or about June 3, 2022, Plaintiff terminated the Consulting Agreement for cause pursuant to paragraph 3.2 of same.

36. After Plaintiff terminated the Consulting Agreement with DTS, Plaintiff was forced to terminate the AVJ Agreement due to that company's numerous breaches of the AVJ Agreement

and non-performance thereunder.

37. Subsequently, three other AVJ subcontractors reached out to Plaintiff requesting payment for their services relating to the Program because they had not been paid by AVJ. These companies advised Plaintiff that they had not received the promised payment from "Tom" or "Tommy" at AVJ.

38. Plaintiff later learned that DTS and AVJ are both incorporated in Delaware and share the same registered agent. Plaintiff also came to suspect that AVJ does not have any legitimate presence in the United States—its mailing address is a residence in Coppell, Texas, the property records for which indicate it is owned by two individuals with no known association to AVJ, and the only other United States addresses it has ever provided are for two different corporate services companies.

39. Further, upon information and belief, Thomas mistakenly used the "tom@avjconsultants.in" e-mail address in correspondence to Plaintiff. Specifically, on or about April 20, 2022, "tom@avjconsultants.in" replied to an e-mail on which that e-mail address was not copied, but "sudhan.thomas@alivi.com"—Thomas's e-mail address for his work as Program director—was copied. In that e-mail, "Tom" thanked Plaintiff for "taking the kind route with" AVJ and "chang[ing] the tone of the conversation this past few days with the AVJ team," stating "[t]hey [AVJ] will jump through hoops of fire . . . for us." These comments would make sense coming from Thomas, but not from any individual at AVJ. Furthermore, Plaintiff is not aware of any individual who goes by "Tom" at AVJ.

40. Based on the foregoing, Plaintiff reasonably believes that Thomas retained AVJ as Program Manager because he had a preexisting relationship with that company, from which he gained a financial benefit—a relationship that Thomas never disclosed to Plaintiff. In doing so,

Thomas improperly collected remuneration from Plaintiff through both DTS and AVJ, for contractual obligations both DTS and AVJ in fact failed to perform, and he did so at Plaintiff's expense.

41. All necessary conditions precedent to Plaintiff bringing this action have occurred or were performed, excused, and/or waived.

## COUNT I
## Breach of Contract
*Against DTS*

42. Plaintiff re-alleges and incorporates by reference paragraphs 1 through 28, 34, 35, and 41 above.

43. This is an action for monetary damages against DTS for its breach of the Consulting Agreement.

44. As set forth above, the parties duly negotiated and entered into the Consulting Agreement.

45. Pursuant to the Consulting Agreement, DTS promised, and at all material times was contractually obligated, to provide the consulting services necessary for successful and timely implementation of the Program, including those enumerated in paragraph 16 above.

46. Plaintiff fully performed in accordance with the terms of the Consulting Agreement by paying DTS for its purported services.[2]

47. As set forth in detail above, however, DTS materially breached the Consulting Agreement by failing to perform its contractual obligations, including as enumerated in paragraphs 26 and 34 above.

---

[2] Plaintiff paid DTS as an independent contractor, with a 1099 issued accordingly based on the handwritten W-9 Thomas provided to Plaintiff for DTS. However, Plaintiff has not been able to validate the EIN for DTS that Thomas provided on the W-9.

48. DTS refused to cure or remedy the foregoing breaches.

49. As a direct and proximate result of DTS's breaches of the Consulting Agreement, Plaintiff has been damaged.

WHEREFORE, Plaintiff prays that this Court enter a judgment against Defendant and in favor of Plaintiff for all direct, incidental, and consequential damages; costs; all applicable interest; and for such other and further relief that this Court may deem just and proper.

## COUNT II
### Breach of Implied Covenant of Good Faith and Fair Dealing
*Against DTS*

50. Plaintiff re-alleges and incorporates by reference paragraphs 1 through 41 above.

51. This is an action for monetary damages against DTS for its breach of the implied covenant of good faith and fair dealing contained within the Consulting Agreement.

52. As set forth above, the parties duly negotiated and entered into the Consulting Agreement.

53. Pursuant to the Consulting Agreement, DTS promised, and at all material times was contractually obligated, to provide the consulting services necessary for successful and timely implementation of the Program, including those enumerated in paragraph 16 above.

54. Plaintiff fully performed in accordance with the terms of the Consulting Agreement by paying DTS for its purported services.

55. As set forth in detail above, however, DTS failed to perform in accordance with the Consulting Agreement by failing to perform its contractual obligations, including as enumerated in paragraphs 26 and 34 above.

56. DTS's failures to perform in accordance with the Consulting Agreement were a conscious and deliberate act that unfairly frustrated the agreed common purpose of the Consulting

Agreement and disappointed Plaintiff's reasonable expectations, as demonstrated by the repeated complaints Plaintiff received from Customer concerning Thomas and DTS.

57. The Consulting Agreement provided DTS with discretion in retaining the Program Manager for the Program. Pursuant to Florida law, the discretion assigned to DTS concerning retention of the Program Manager thus carried with it an implied duty of good faith and fair dealing when exercising such discretion. This duty of good faith and fair dealing required DTS, at the least, to exercise impartiality and to avoid any conflict of interest in the selection of a Program Manager for the Program.

58. By failing to disclose his preexisting relationship with AVJ, Thomas, as President of DTS, breached the implied covenant of good faith and fair dealing in the selection of AVJ of the Program Manager.

59. By falsely representing to Plaintiff that cards and confirmation e-mails had been sent to members and conspiring with AVJ to alter the card delivery figures and report false figures to Plaintiff, Thomas, as President of DTS, breached the implied covenant of good faith and fair dealing in performing the services required in Exhibit A to the Consulting Agreement, including but not limited to executing the day-to-day and periodic operational oversight of the Program.

60. By attempting to solicit one of Plaintiff's providers for his illegal patient steering scheme, as alleged in paragraph 30 above, Thomas, as President of DTS, breached the implied covenant of good faith and fair dealing in performing the services required in Exhibit A to the Consulting Agreement, including but not limited to executing the day-to-day and periodic operational oversight of the Program.

61. By attempting to broker a sale of ELS's application and associated technology directly to Plaintiff, in which he would retain a portion of the proceeds from that proposed sale,

Thomas, as President of DTS, breached the implied covenant of good faith and fair dealing in performing the services required in Exhibit A to the Consulting Agreement, including but not limited to acting as the single point of contact between Plaintiff and the Program Manager.

62. DTS's foregoing actions and inactions constitute breaches of the implied covenant of good faith and fair dealing contained within the Consulting Agreement, and accordingly, constitute a breach of the Consulting Agreement.

63. DTS refused to cure or remedy the foregoing breaches.

64. As a direct and proximate result of DTS's breaches of the implied covenant of good faith and fair dealing contained within the Consulting Agreement, Plaintiff has been damaged.

WHEREFORE, Plaintiff prays that this Court enter a judgment against Defendant and in favor of Plaintiff for all direct, incidental, and consequential damages; costs; all applicable interest; and for such other and further relief that this Court may deem just and proper.

## COUNT III
## Fraud
*Against Thomas*

65. Plaintiff re-alleges and incorporates by reference paragraphs 1 through 25, 29, 31 through 34, and 36 through 41 above.

66. On or about April 21, 2021, Thomas sent an e-mail to Plaintiff's CEO, advising Plaintiff that he would select AVJ as the Program Manager for the Program upon being hired as a consultant for the Program.

67. Thomas later confirmed this selection of AVJ as the Program Manager, which was consummated when Plaintiff and AVJ signed the AVJ Agreement.

68. In advising Plaintiff that he would select AVJ as the Program Manager for the Program, Thomas intentionally omitted the material fact that he had a preexisting relationship with,

and financial interest in, AVJ, thereby concealing from Plaintiff information not otherwise known to or knowable by Plaintiff.

69. Thomas in fact advised multiple different individuals and entities—truly, almost every entity involved in the Program *other* than Plaintiff—that he was the principal, director, and/or majority shareholder of AVJ.

70. Thomas also acted on behalf of and as agent for AVJ in his interactions with AVJ's subcontractors, including by advising them that he was AVJ's "exclusive contact" for the Program, and by using the e-mail address "tom@avjconsultants.in" in his communications with AVJ subcontractors.

71. Thomas actively and intentionally misled Plaintiff as to the nature of his relationship with AVJ for his own financial benefit—namely, *additional* remuneration from Plaintiff through AVJ.

72. Thomas's dishonesty concerning his relationship with AVJ spanned the entirety of his role as a consultant for Plaintiff. From the very inception of Plaintiff's relationship with Thomas, Thomas went to great lengths to actively conceal his relationship with and financial interest in AVJ, including by: failing to disclose that relationship and interest to Plaintiff when he first selected AVJ as Program Manager; using various aliases in his interactions with AVJ's subcontractors; using different e-mail addresses, including "tom@avjconsultants.in" and "sudhan.thomas@alivi.com," in communicating with Plaintiff, Customer, and AVJ's subcontractors; and obstructing, personally or with the help of others purporting to work at AVJ, Plaintiff's attempts to arrange in-person meetings with AVJ.

73. Thomas also purposely misled Plaintiff as to AVJ's knowledge and experience in the technology and systems necessary to implement and manage the Program. AVJ in fact had no

such knowledge or experience, and instead subcontracted the bulk of its services under the AVJ Agreement to ELS. Thomas does not have any interest in ELS, but he does have an interest in AVJ. Accordingly, by misleading Plaintiff as to AVJ's experience, and then subcontracting with ELS to create and maintain the actual online platform for many of the services AVJ contracted to supply, Thomas intentionally misled Plaintiff so as to obtain a greater financial benefit for himself.

74. Thomas knew or should have known that information concerning his preexisting relationship with and financial interest in AVJ, and AVJ's relative lack of knowledge and experience, would have been material to Plaintiff's determination as to whether to enter into the AVJ Agreement, and thus knew or should have known that it was false or misleading to omit and actively conceal that information.

75. Thomas made the foregoing omissions and misrepresentations with the intention that Plaintiff rely on his incomplete and false statements concerning AVJ by entering into the AVJ Agreement and by continuing to use AVJ as Program Manager.

76. Plaintiff did in fact rely on Thomas's incomplete statements concerning AVJ when it entered into the AVJ Agreement and when it continued to use AVJ as Program Manager.

77. AVJ substantially failed to perform in accordance with the AVJ Agreement, Plaintiff's expectations, and/or industry standards. Accordingly, Plaintiff was forced to terminate the AVJ Agreement and enter into a contract directly with ELS.

78. As a direct and proximate result of Plaintiff's reliance on Thomas's false and incomplete statements, Plaintiff has been damaged.

WHEREFORE, Plaintiff prays that this Court enter a judgment against Defendant and in favor of Plaintiff for all direct, incidental, and consequential damages; costs; all applicable interest; and for such other and further relief that this Court may deem just and proper.

DATED this 17th day of October, 2022.

                                             Respectfully submitted,

**SHAPIRO, BLASI, WASSERMAN & HERMANN, P.A**.
7777 Glades Road, Suite 400
Boca Raton, FL 33434
Tel:561-477-7800, Fax: 561-477-7722
*Attorneys for Plaintiffs*

By /s/ *Genevieve Lee Turner*
Adam S. Chotiner, Esq.
Florida Bar No. 0146315
Email: achotiner@sbwh.law
Genevieve Lee Turner, Esq.
Florida Bar No.100058
Email: gturner@sbwh.law